**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Misc. No.      20-mc-00011-WJM

UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,

     Petitioner,

v.

FRAN GOMEZ, Interim Sheriff, City of Denver,

     Respondent.

---

**PETITION TO ENFORCE ADMINISTRATIVE SUBPOENAS**

---

United States Immigration and Customs Enforcement (ICE) respectfully petitions for an order directing Respondent Fran Gomez, the Interim Sheriff for the City of Denver, to comply with three administrative subpoenas issued by ICE.  The subpoenas, issued under 8 U.S.C. § 1225(d)(4), seek documents relevant to immigration-related investigations of three aliens who each have previously been convicted in federal court for unlawfully entering the United States and who each have recently been charged with state-law criminal offenses.  Respondent, though counsel, has indicated that Respondent will not comply with the subpoenas.

As explained below, the subpoenas should be enforced because § 1225(d)(4)(B) provides for such an order and because they meet the applicable standards for administrative subpoenas: they are issued within the federal agency's statutory authority, they seek information reasonably relevant to an inquiry by ICE, they are not too indefinite, and they are not unduly burdensome.[1]

---

[1]      ICE intends to file a separate motion under Fed. R. Civ. P. 81(a)(5) for an order setting a briefing schedule for Respondent to file a response to this Petition and for ICE to file a reply.

## JURISDICTION AND VENUE

1.      The Court has subject-matter jurisdiction over this petition under 28 U.S.C.

§§ 1331, 1345, and 8 U.S.C. § 1225(d)(4)(B), which provides for a subpoena enforcement action

to be filed in "[a]ny United States district court within the jurisdiction of which investigations or

inquiries are being conducted by an immigration officer…."  The investigations of the three

aliens at issue are being conducted within this judicial district.

2.      Venue is proper in this district under 8 U.S.C. § 1225(d)(4)(B) because ICE is

conducting its investigation within this district, and under 28 U.S.C. § 1391(b)(1) because

Respondent resides in this district.

## BACKGROUND

3.      The federal government has "broad, undoubted power over the subject of

immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012).

4.      Congress has enacted laws governing the entry, presence, status, and removal of

aliens within the United States.  These laws codify the Executive Branch's authority to inspect,

investigate, arrest, detain, and remove aliens in accordance with those provisions. *See, e.g.,*

8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231, 1357.

5.      ICE is responsible for the investigation, arrest, detention, and removal of aliens

within the United States.  6 U.S.C. § 251 (transferring to the Secretary of Homeland Security

functions relating to the inspection, investigation, detention and removal of aliens); *Clark v.*

*Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005) (noting that the powers of investigation and

detention of aliens formerly provided to the Attorney General were transferred to the Department

of Homeland Security and its components, including ICE).

A.     **ICE's investigations of the aliens at issue**

6.      ICE is investigating three aliens, each of whom was previously ordered removed from the United States and was removed, but then illegally reentered the United States without being admitted or paroled by an immigration official.  See Ex. A (Declaration of David Thompson) at ¶¶ 7-42.  The three aliens are Olman Ramirez-Ramirez, Cecelio Torres-Ibarra, and Juan Miguel Sanchez-Martin.  *Id.*

7.      Each of these aliens has also previously been convicted in federal court of an offense related to unlawful entry into the United States.  Ex. A at ¶¶ 10, 21, 32.

8.      Each of these aliens was recently arrested by the Denver Police Department.  Mr. Ramirez-Ramirez was arrested in November 2019 for assault and domestic violence and making a false report; Mr. Torres-Ibarra in November 2019 for sexual assault; and Mr. Sanchez-Martin in December 2019 for vehicular homicide/reckless driving and for hit-and-run/leaving the scene of an accident involving death.  *Id*. at ¶¶  8, 13, 20.

9.      ICE has access to some information concerning the three aliens through nationwide electronic databases, principally the National Criminal Information Center ("NCIC") database.  *Id.* ¶ 6.  The NCIC database contains biometric information concerning aliens, such as fingerprint records, physical descriptions, nationality, known aliases, and, sometimes, address information and criminal history.  *Id.*  However, the address information available in NCIC is often not up to date, and the criminal history information available is typically in the form of a list of arrests, charges, and convictions, that contains little or no factual information concerning the underlying crimes.  *Id.*

10.     Based on the information presently available concerning the aliens, ICE has determined that each of the three aliens may be subject to removal from the United States and may be subject to detention by ICE pending their removal.  *See* 8 U.S.C. § 1231(a)(5) ("If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened to reviewed, the alien is not eligible and may not apply for relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry."); § 1231(a)(2) (providing that the government "shall detain" an alien during the removal period).

11.     The aliens also may be subject to detention by ICE based on their criminal history or other factors.  See 8 U.S.C. § 1231(a)(6) (providing for detention of certain inadmissible or criminal aliens); § 1226(c) (providing that the Attorney General "shall take into custody" aliens who have committed certain offenses).

12.     Finally, the aliens may also be subject to federal criminal prosecution for immigration offenses.  *See* 8 U.S.C. § 1326 (establishing criminal penalties for reentering the United States after a prior denial of admission, exclusion, deportation, or removal).

**B.     ICE's requests to Respondent for information about these aliens**

13.     With respect to each of these three aliens, ICE issued a detainer form to the Denver Sheriff's Department requesting to be notified if the alien were released.  *See* Ex. A at ¶¶ 8, 13, 20.

14.     Two of the aliens at issue were released by the Denver Sheriff's Department in November 2019.  *Id.* ¶¶ 9, 14.  As to Mr. Torres-Ibarra, ERO received a fax notification of the

release but could not respond to the location prior to the projected release time. *Id*. at ¶ 15.  As to Mr. Ramirez-Ramirez, DSD notified ICE at 1:18 p.m. on Saturday, November 30, that Mr. Ramirez-Ramirez would be released between 1:20 p.m. and 3:20 p.m.  *Id.* ¶ 14.  ICE personnel were unable to immediately and safely respond to this notification.  *Id.*

15.     The whereabouts of Mr. Ramirez-Ramirez and Mr. Torres-Ibarra are not currently known.  Id. at ¶ 19, 30.

16.     Mr. Sanchez-Martin remains in the custody of the Denver Sheriff's Department. *See* Ex. A at ¶ 38.  ICE believes that he has been granted the right to release on posting of a $500,000 bond, but has not yet posted that bond.  *Id.*

17.     On January 3, 2020, ICE sent a fax to the Denver Sheriff's Department seeking information about the address and criminal case for each of the aliens.  Ex. A at ¶¶ 18, 29, 42.

18.     ICE did not receive a response to this fax.  *See id.*

**C.     ICE's subpoenas to Respondent**

19.     In 8 U.S.C. § 1225(d)(4)(A), Congress has authorized immigration officers to "require by subpoena . . . the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service."  The term "this chapter" in the statute broadly refers to Title 8, United States Code, Chapter 12 ("Immigration and Nationality"), which encompasses 8 U.S.C. §§ 1101–1537, and the "Service" now refers to the U.S. Department of Homeland Security.

20.     On January 13, 2020, ICE issued administrative subpoenas directed to Respondent concerning each of the three aliens.[2] Ex. A at ¶ 43.  Copies of those subpoenas are attached as Exhibit B.

21.     On January 13, 2020, the subpoenas were served on, and accepted by, a captain in the Denver Sheriff's Department ("DSD") who was the highest ranking official present at the Denver Justice Center operated by Respondent.  Ex. A at ¶ 43.

22.     Each subpoena sought two sets of documents.  First, each sought "[d]ocuments sufficient to establish the following for [the alien]: Home Address, Employment Address, Country of Birth, Place of Birth, Age, Identification Documents (i.e. driver license number and state, foreign identification card number and country, passport number and country), Bond Information to include the obligor name and address, Federal Bureau of Investigation Number, Emergency Contact address and phone number, including copies of all identification documents."  Ex. B.

23.     Documents containing this information would assist ICE in several ways.  The basic identification information sought in the subpoena (such as name, date of birth, nationality, and FBI number) will allow ICE to verify that the aliens formerly held in DSD custody are in fact the same individuals that ICE is investigating.  This corroboration can be obtained only by review of the DSD documents.  Ex. A at ¶ 46.

24.     The information concerning each alien's addresses, as well as the contact information for the alien's bond obligor and emergency contacts, will assist ICE in locating the

---

[2]     ICE served a fourth subpoena concerning a fourth alien.  That individual has been apprehended and is now in federal custody, so ICE is not seeking enforcement of that subpoena at this time.

aliens and in assessing how best to safely take them into custody. While ICE has access to some address information for some of the aliens via the NCIC database, that information is frequently not up to date. Obtaining the most up-to-date address and contact information can be critical to the safety of ICE officers in apprehending individuals under investigation. Using outdated address information also wastes resources. The contact information that the aliens provided to DSD upon their arrests are the most up-to-date contact information for these individuals. DSD has not provided that recent information, and ICE cannot obtain this information from any other source. *Id.* at ¶ 47.

25.     Obtaining multiple addresses (such as for both a home address and work address) also aids law enforcement in ensuring that the apprehending officers have at least one correct address. If they obtain multiple addresses, they can choose an approach in apprehending the alien that minimizes the risk of harm. *Id.* at ¶ 48.

26.     Contact and location information also aid in an investigation that may lead to potential criminal prosecution of an alien. Criminal charges for illegal reentry are subject to a statute of limitations, which can mean that a delay in apprehending an alien can interfere with the option of criminal prosecution. Possessing the most up-to-date contact information permits CIE to apprehend these aliens quickly. *Id.* at ¶ 49.

27.     The subpoenas also sought documents concerning identification documents, including copies of all identification documents. Aliens apprehended by local law enforcement sometimes possess false identification documents, or falsely claim citizenship or provide false identities to local law enforcement agencies. Aliens also may provide documents including other information that is not reflected in the charge itself and is not reported and accessible in national

law enforcement databases.  Sometimes possessing false documents is, itself, a crime.  DSD may have copies of documents that an alien had on his person at the time of arrest.  ICE has no other source from which to access these documents.  *Id.* at ¶ 50.

28.     Second, the subpoenas sought, for each alien, "[d]ocuments that show the criminal charge relating to [the alien]," and provided identifying information known to ICE about the charge, such as the arrest date, the charge, and the booking number.  Ex. B.

29.     While ICE has access through NCIC and other databases to some basic information concerning the criminal charge (such as the name of the charged crime, date of arrest, and booking number), these sources do not typically contain any factual information regarding the underlying conduct that led to the arrest and charge.  Ex. A at ¶ 51.

30.     The documents held by DSD that show the criminal charge, in contrast, may contain useful documents such as probable cause statements, arrest reports, and/or additional documents that may contain factual information that provides significantly more detail concerning the criminal conduct alleged against the alien. *Id.* at ¶ 52.

31.     The documents that show the criminal charge also may include information that sheds light on where the alien may be found.  These documents may include information about any bond obligor, who may have knowledge of an alien's most recent whereabouts.  The documents also may reflect information gathered by law enforcement about where to locate the alien.  *Id.* at ¶ 53.

32.     The documents containing a state criminal charge also have evidentiary value in proving an alien's criminal history in either administrative or federal court proceedings.  Because

this evidentiary value is inherent in the actual criminal charging documents themselves, ICE has no other source of this evidentiary information than DSD.  *Id.* at ¶ 54.

33.     Documents containing information relating to the criminal charge assist ICE in various ways:  in assessing if the alien is removable, in evaluating whether the alien may and should be referred for criminal prosecution, and in assessing each alien's potential level of dangerousness to ICE arresting officers and to the public.  The information shown in these documents also can aid ICE to assess the appropriateness of detention of an alien post-apprehension.  *Id.* at ¶ 55.

34.     Unless DSD provides the criminal charging documents, ICE has no other readily available source from which to access these documents.  *Id.* at ¶ 56.

**D.     Respondent's decision not to comply with the subpoena**

35.     The administrative subpoenas required Respondent to produce the requested documents by January 16, 2020 (as to Mr. Sanchez-Martin) and/or January 27, 2020 (as to the other two aliens).  *See* Ex. A at ¶ 57; Ex. B.

36.     On Thursday, January 16, 2020, Ronald Strong, Assistant Field Office Director for ICE's Denver Field Office, was notified by counsel for the Denver Sheriff's Department that Respondent would not comply with the subpoenas.

37.     In subsequent communications between counsel for ICE and for Respondent about Respondent's decision not to comply with the subpoenas, counsel for Respondent (at the Denver City Attorney's Office) cited to a provision in a local ordinance, Denver Revised Municipal Code § 28-250.  That provision states that Denver city employees may not expend City funds "to assist in the enforcement of federal immigration laws."  Denver Rev. Munic. Code

§ 28-250(a).  This ordinance includes an exception that states that Denver law enforcement may

cooperate with federal law enforcement regarding immigration "as long as the primary purpose

of the coordinated action is the enforcement of city, state or federal criminal laws."  *Id.* § 28-

250(c).

38.     Through counsel, ICE represented to the City of Denver that ICE would use the

information sought via the subpoenas, in part, to determine whether any of the aliens would be

subject to federal criminal prosecution under 8 U.S.C. § 1326.

39.     On February 3, 2020, counsel for Respondent confirmed that it will not produce

the documents sought under the subpoenas.  Counsel for Respondent observed that the

subpoenas are not enforceable without a federal court order.  Ex. A at ¶ 58.

40.     Congress has provided that where the recipient of a subpoena issued under

8 U.S.C. § 1225(d)(4)(A) fails to comply with the subpoena, the Attorney General or

immigration officer "may invoke the aid of any court of the United States" to enforce the

subpoena.  8 U.S.C. § 1225(d)(4)(A).

41.     Congress has also provided district courts with authority to direct compliance

with such subpoenas.  "Any United States district court within the jurisdiction of which

investigations or inquiries are being conducted by an immigration officer may, in the event of

neglect or refusal to respond to a subpoena issued under this paragraph or refusal to testify before

an immigration officer, issue an order requiring such persons to appear before an immigration

officer, produce books, papers, and documents if demanded, and testify, and any failure to obey

such order of the court may be punished by the court as a contempt thereof."  8 U.S.C.

§ 1225(d)(4)(B).

## ARGUMENT

The Court should issue an order directing Respondent to comply with the subpoenas. First, the subpoenas meet the well-established controlling legal standards that apply to administrative subpoenas.  Second, to the extent Respondent may seek to resist compliance based on a city ordinance, the ordinance is preempted by § 1225(d)(4) to the extent the ordinance would present an obstacle to the enforcement of the subpoenas.

**I.    The subpoenas meet the controlling legal standards.**

The Supreme Court has held that an administrative subpoena "is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant."  *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950); *accord McLane v. EEOC*, 137 S. Ct. 1159, 1165 (2017) (holding that if the information sought by an administrative subpoena is relevant to the agency's inquiry, "the district court should enforce the subpoena" unless the subpoena "is 'too indefinite,' has been issued for an 'illegitimate purpose,' or is unduly burdensome").

Under those standards: (a) ICE's issuance of the subpoenas was "within the authority of the agency"; (b) the demand in ICE's subpoenas for documents showing certain information about the aliens under investigation was specific and thus "not too indefinite"; and (c) the documents sought are "reasonably relevant" to those investigations.  *Morton Salt*, 338 U.S. at 652.

**A.    ICE had authority to issue the administrative subpoenas.**

The first element of the *Morton Salt* test is met because issuing the subpoenas was "within the authority of the agency."  *Morton Salt*, 338 U.S. at 652.

The Supreme Court has recognized that the administrative subpoena authority of a federal agency is broad because the purpose of an administrative subpoena is not adjudicative, but is instead a power "to inquire."  *United States v. Clarke*, 573 U.S. 248, 254 (2014) (explaining that the purpose of an IRS summons "is 'not to accuse,' much less to adjudicate, but only 'to inquire'"); *United States v. Powell*, 379 U.S. 48, 57 (1964) (discussing other agencies' administrative subpoena powers as a "power of inquisition") (quoting *Morton Salt*, 338 U.S. at 642-43).  Administrative agencies possess "powers of original inquiry" that allow them to "take steps to inform [themselves] as to whether there is probable violation of the law." *Morton Salt*, 338 U.S. at 642-43.

ICE's authority under this provision is not limited to determining the admissibility of aliens entering the United States.  In § 1225(d)(4)(A), Congress empowered ICE immigration officers to issue administrative subpoenas to seek documents that relate to whether an alien may reside in the United States, *or* to aid in the enforcement of the immigration laws as to aliens.  In the relevant provision, Congress permitted such subpoenas to be issued "relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the service…" 8 U.S.C. § 1225(d)(4)(A).  The "chapter" refers to Title 8, Chapter 12, of the United States Code, which encompasses, in Subchapter II, the topic of "Immigration," which in turn includes, in Part IV, the immigration statute's provisions related to "Inspection, Apprehension, Examination, Exclusion, and Removal" of aliens.  *See* 8 U.S.C. Chapter 12, Subchapter II, Part IV, at §§ 1221-1232.

Section 1225(d)(4)(A) provides ICE with authority to demand documents not only relating to aliens entering the United States, but on matters "encompass[ing] the full range of subjects covered by the [the Immigration and Nationality Act of 1952]." *United States v. Minker*, 350 U.S. 179, 185-86 (1956). In *Minker*, the Supreme Court considered this provision as it appeared in a predecessor statute. It observed that the provision, when originally drafted, extended only to "documents touching the right of any alien to enter, reenter, reside in, or pass through the United States," but Congress later added language that "extended the subpoena power…." *Id*. at 184-85. The Court ruled that after this amendment, the scope of this subpoena power could not reasonably be viewed as limited to matters relating "to an investigation pertaining to questions of admission and deportation" because "[t]he comprehensive addition of the clause 'or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service', precludes such narrowing reading." *Id.* at 185. The Court observed that this subpoena provision did appear "in the immigration title" of the statute, but explained that "the title of a statute and the heading of a section cannot limit the plain meaning." *Id.*[3]

Since *Minker*, courts have observed that *Minker* precludes a narrow reading of this subpoena power. *See United States v. Van*, 931 F.2d 384, 387 (6th Cir. 1991) ("Although [this subpoena provision] appears in a part of the Immigration Act that describes the powers of INS agents on border patrol, the Supreme Court has held that the addition of the clause 'or

---

[3] The *Minker* Court went on to address whether this provision gave immigration officers authority to question, as "witnesses," United States citizens facing denaturalization; the Court concluded that "considerations of policy" led it to interpret the provision as not providing this authority. 350 U.S. at 187-90. That holding does not apply here, as none of the aliens under investigation here are United States citizens facing denaturalization.

concerning any matter which is material and relevant to the enforcement of the Act' encompasses the full range of subjects covered by the statute") (citing *Minker*, 350 U.S. at 184-85); *see also Sherman v. Hamilton*, 295 F.2d 516, 522 (1st Cir. 1961) (affirming district court's order enforcing subpoena under predecessor statute).

Here, ICE is investigating these three aliens who reentered the United States unlawfully after removal, and seeks documents showing basic information relating to the identity, location, and recent criminal charges as to each alien.  These matters fall within the broad scope of inquiry authorized by Congress in § 1225(d)(4)(A).  ICE is authorized to investigate such matters. Aliens who reenter the country unlawfully after removal are subject to civil reinstatement of their removal orders, and detention awaiting their removal.  8 U.S.C. § 1231(a)(5) (providing for reinstatement of prior removal orders); § 1231(a)(1) providing for detention awaiting removal). In addition, "[u]nlawful entry and unlawful reentry into the country are federal offenses. §§ 1325, 1326."  *Arizona v. United States*, 567 U.S. 387 (2012).

Because ICE is authorized to investigate these aliens, its subpoenas are authorized by § 1225(d)(4)(A).  *Cf. United States v. Ragauskas*, No. 94-c-2325, 1994 WL 445465, at *2 (N.D. Ill. Aug. 12, 1994) (enforcing an administrative subpoena under § 1225 in an investigation of a permanent resident alien suspected of collaborating with the Nazis, and concluding that "[c]learly, the investigation is authorized by Congress for a legitimate purpose").  Section 1225(d)(4)(A) does not require ICE to make any other showing.  *Cf. Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 198-99, 208-09 (1946) (where a statute permitted the Department of Labor to "investigate such … matters as he may deem appropriate to determine whether any person has violated any provision of the Act," it was "not necessary … that a specific charge or

complaint of violation of law be pending or that the order be made pursuant to one.  It is enough

that the investigation be for a lawfully authorized purpose, within the power of Congress to

command.").  And Respondent has not suggested that the investigations of the three aliens at

issue fall outside the scope of ICE's enforcement authority.

> **B.      ICE's demand for documents is not too indefinite.**

The second element of the *Morton Salt* test is met because ICE's subpoenas are specific

and thus not "too indefinite."  *Morton Salt*, 338 U.S. at 652.  The definiteness requirement

ensures that the records sought can be identified by their description in the subpoena.  *Cf. Okla.

Press Pub. Co. v. Walling*, 327 U.S. 186, 208 (1946) (explaining that a subpoena may be

improper if there is "too much indefiniteness or breadth" in the request); *cf. Perez v. Alegria*,

No. 15-mc-401-SAC, 2015 WL 4744480, at *3 (D. Kan. Aug. 11, 2015) (explaining that an

administrative subpoena is sufficiently definite when "[a]ll of the categories of information are

sufficiently specific to enable" the recipient of the subpoena "to understand what information the

[agency] seeks.").

Each subpoena here is sufficiently definite.  Each requests documents that show

information that is clearly defined.  Each subpoena requests two sets of documents.  First, each

subpoena seeks documents sufficient to establish, for the alien at issue, certain basic

identification and address information.  *See supra* ¶¶ 22, 28; Ex. B.  Second, each subpoena

seeks, for each alien, documents that show the criminal charge relating to the alien.  *Id.*

These subpoenas are sufficiently specific that they do not burden Respondent by

requiring Respondent to review a wide array of materials and make complex judgments as to

their potential responsiveness.  And Respondent has not suggested that the subpoenas are too indefinite.

### C.      The information sought is reasonably relevant to the investigations.

Finally, the third element of the *Morton Salt* test is met because the documents sought are "reasonably relevant" to the ongoing investigations.  *Morton Salt*, 338 U.S. at 652.

Courts have made clear that the scope of information that may be sought by an administrative subpoena is much broader than the subpoena authority available during a judicial process.  The Supreme Court made this point in *Morton Salt*, where a corporation challenged the authority of the Federal Trade Commission to issue administrative subpoenas.  The corporation argued that the FTC's subpoena was too broad because it was "engaged in a mere 'fishing expedition' to see if it can turn up evidence of guilt."  338 U.S. at 641.  In rejecting this argument, the Court criticized prior courts that had rejected administrative subpoenas by "engraft[ing] judicial limitations upon the administrative process."  *Id*. at 642; *see also id.* ("This case illustrates the difference between the judicial function and the [investigative] function the [FTC] is attempting to perform.").  The Court in *Morton Salt* explained that administrative subpoenas can properly be based on "official curiosity" about whether a party has complied with the law.  *See id.* at 652 ("Even if one were to regard the request for information in this case as caused by nothing other than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest."); *see also Phillips Petroleum v. Lujan*, 951 F.2d 257, 260 (10th Cir. 1991) (citing *Morton Salt* for the proposition that an agency "could compel the production of information *even if [the] action was a 'fishing expedition'*") (emphasis added).

16

Accordingly, where an agency has the authority to issue an administrative subpoena to investigate a matter, "relevance" is given a broad meaning.  The Supreme Court recognized this principle in *United States v. Arthur Young & Co.*, 465 U.S. 805 (1984), where it explained that where a statute permitted the IRS to "'examine any books, papers, records or other data which may be relevant or material' to a particular tax inquiry," the inquiry was "not to be judged by the relevance standards used in deciding whether to admit evidence in federal court," and that the IRS "should not be required to establish that the documents it seeks are actually relevant in any technical, evidentiary sense."  *Id.* at 813-14; *see also id.* at 815 ("Records that illuminate any aspect of the return … are therefore highly relevant to legitimate IRS inquiry.").  *See also EEOC v. Dillon Cos., Inc.*, 310 F.3d 1271, 1274-75 (10th Cir. 2002) (observing that in the context of administrative subpoenas, the relevance requirement "'is not especially constraining'") (quoting *EEOC v. Shell Oil Co.*, 466 U.S. 54, 68 (1984)).

Here, ICE's subpoenas meet the requirements for "reasonable relevance" because the documents sought relate directly to the aliens under investigation.  ICE has reasonably determined that these documents are relevant and material to those investigations.  As explained above and in the accompanying declaration, the documents will aid ICE in identifying the aliens (in various ways), confirming their alienage, determining ways the aliens could be contacted or located, and ascertaining their recent criminal activity and history.  This information will aid in determining whether the aliens are removable, in potentially securing their apprehension, in evaluating their dangerousness to ensure the safety of law enforcement officers who may seek to apprehend them and the safety of the public, and in determining whether the aliens, if

apprehended, may be appropriate detention and for criminal prosecution.  *See generally supra* at ¶¶ 23-33; Ex. A ¶¶ 45-57.

In sum, the subpoenas meet all elements of the *Morton Salt* test.  Because the agency had authority to issue the subpoenas, and the documents sought are relevant to the agency's investigations, the Court should enforce the subpoenas. *Cf. Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943) (holding that a district court had a "duty" to order production of evidence sought by the Department of Labor through an administrative subpoena where "[t]he evidence sought was not plainly incompetent or irrelevant to any lawful purpose of the agency").

## II.     Respondent has cited an ordinance as a basis for not complying with the subpoenas, but the ordinance does not prevent this Court from enforcing the subpoenas.

In declining to comply with the subpoenas, counsel for Respondent has pointed, for support, to a Denver ordinance.  *See supra* at ¶ 37.  To the extent Respondent relies on this ordinance as a basis for noncompliance with the subpoenas, the Court should hold that the subpoenas are enforceable.  If the ordinance would interfere with the enforcement of the administrative subpoenas here, it is preempted and without effect, as explained below.

The Denver ordinance Respondent has cited in not complying with the subpoenas purports to prohibit City departments and employees from assisting or cooperating with federal investigations relating to the federal immigration laws, except that the ordinance permits City law enforcement officials to choose to cooperate with federal law enforcement officials where the primary purpose of the enforcement action is enforcement of federal criminal laws. Specifically, in Ordinance Number 940-17 § 1, adopted on August 28, 2017, the City adopted section 28-250 of the Denver Revised Municipal Code.  That Code provides, in pertinent part:

**Sec. 28-250. - Use of city funds and resources limited; exceptions.**

(a) Except as specifically authorized in this article VIII, no department, agency, board, commission, officer, or employee of the city … shall use any city funds or resources to assist in the enforcement of federal immigration laws.  The prohibition set forth in this section shall include but not be limited to:

> (1) Assisting or cooperating in one's official capacity with any investigation, detention, or arrest procedures relating to alleged violations of the civil provisions of federal immigration laws.

> \* \* \*

(c) City law enforcement officers may respond to calls from assistance from federal immigration authorities to the extent necessary to keep the peace, protect public safety, or enforce any applicable state and criminal laws beyond the scope of effectuating an immigration arrest.  Nothing in subsection (a) of this section shall preclude city law enforcement officers from participating in coordinated law enforcement actions with federal law enforcement agencies, as long as the primary purpose of the coordinated action is the enforcement of city, state or federal criminal laws."

Denver Rev. Munic. Code § 28-250 (attached hereto as Ex. C).  But this ordinance provides no basis for the Court not to enforce the subpoenas.

"It has long been settled that state laws that conflict with federal law are without effect." *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 479-80 (2013).  "The Supremacy Clause provides that the laws and treaties of the United States 'shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary Notwithstanding." *Id.* at 479 (quoting U.S. Const., Art. VI, cl. 2).  "[U]nder the Supremacy Clause, from which our preemption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (quoted in *Bartlett*, 570 U.S. at 480).  Conflict preemption includes "cases where compliance with both federal and state regulations is a

physical impossibility." *Arizona v. United States*, 567 U.S. 387, 399 (2012).  It also includes

"instances where the challenged state law stands as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress." *Id.* at 399-400 (internal quotation

marks and citation omitted).

Under the principle of conflict preemption, a state statute is without effect to the extent it

would pose an obstacle to the enforcement of an administrative subpoena.  For example, in

*Oregon Prescription Drug Monitoring Program v. U.S. DEA*, 860 F.3d 1228 (9th Cir. 2017), the

Ninth Circuit held that a provision of Oregon state law that required a court order before the

DEA could obtain data from the state was preempted by a provision of the Controlled Substances

Act providing the Attorney General with authority to issue administrative subpoenas.  *Id.* at

1236.  The court explained that the state statute was in "positive conflict" with the federal statute

authorizing administrative subpoenas because the state statute "'interferes with the methods by

which the federal statute was designed to reach its goal.'" *Id.* (quoting *Gade*, 505 U.S. at 103).

*Accord U.S. Dep't of Justice v. Utah Dep't of Commerce*, No. 2:16-cv-611-DN-DBP, 2017 WL

3189868, at *6-7 (D. Utah July 27, 2017) (ruling that this same provision of the Controlled

Substances Act authorizing administrative subpoenas preempted a Utah statutory provision that

required a warrant for access to certain state data); *U.S. Department of Justice v. Colo. Bd. of

Pharmacy*, No. 10-cv-01116-WYD-MEH, 2010 WL 3547898 (D. Colo. Aug. 13, 2010) (ruling

that this same provision of the Controlled Substances Act authorizing administrative subpoenas

preempted a Colorado statutory provision limiting the information the state could disclose),

*report and recommendation adopted by* 2010 WL 3547896 (D. Colo. Sept. 10, 2010).

Courts have explained that when a federal agency issues an administrative subpoena and a state law would prevent the federal agency "from obtaining the records it seeks," the state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *United States v. Zadeh*, 820 F.3d 746, 752 (5th Cir. 2016) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Presley v. United States*, 895 F.3d 1284, 1292 (11th Cir. 2018) (holding that a state constitutional provision was preempted when it conflicted with a federal agency's authority to summon records); *Gilbreath v. Guadalupe Hosp. Found. Inc.*, 5 F.3d 785, 791 (5th Cir. 1993) (holding that a state law creating a physician-patient privilege cannot block "subpoenas issued under federal statutory authority"). In a different context, the Tenth Circuit has found preemption where a state law purported to limit the circumstances where federal prosecutors could issue grand jury subpoenas. *United States v. Supreme Court of N.M.*, 839 F.3d 888, 928 (10th Cir. 2016).

Here, Respondent has pointed to the City's ordinance in resisting ICE's subpoenas. But to the extent this ordinance poses any obstacle to ICE's ability to collect documents with the subpoenas it issued under 8 U.S.C. § 1225(d)(4), the ordinance is without effect. Thus, the ordinance does not prevent this Court from directing Respondent to comply with the subpoenas.

## RELIEF REQUESTED

The United States respectfully requests that the Court issue an order, pursuant to 8 U.S.C. § 1225(d)(4)(b), that requires Respondent to comply with the three administrative subpoenas at issue.

Respectfully submitted this 6th day of February, 2020.

JOSEPH H. HUNT
Assistant Attorney General

EREZ REUVENI
Assistant Director


*s/Francesca Genova*
FRANCESCA GENOVA
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone:  202-305-1062
Email: Francesca.M.Genova@usdoj.gov


Counsel for U.S. Immigration
    and Customs Enforcement

JASON R. DUNN
United States Attorney


*s/ Kyle Brenton*
Kyle Brenton
Kevin Traskos
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO  80202
Telephone:  303-454-0100
Email:  kyle.brenton @usdoj.gov
Email:  kevin.traskos@usdoj.gov


Counsel for U.S. Immigration
    and Customs Enforcement