**IN THE U.S. DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-mc-00011-WJM

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,

Petitioner,

v.

FRAN GOMEZ, Interim Sheriff, City of Denver,

Respondent.

---

**RESPONSE TO PETITION TO ENFORCE ADMINISTRATIVE SUBPOENAS**

---

Respondent, Fran Gomez, Sheriff for the Denver Sheriff's Department ("DSD"), through undersigned counsel, submits her Response to Petition to Enforce Administrative Subpoenas as follows:

**Introduction**

This case involves an attempt by the federal government to force a local government to expend public safety resources on federal civil immigration enforcement without a legitimate, good faith need. It is a case that hinges on the intersection of federal civil immigration policies and a city's control over its local law enforcement and traditional police powers. It is also a case of first impression.

At issue are three administrative subpoenas served on Denver's Sheriff Fran Gomez by U.S. Immigration and Customs Enforcement ("ICE") to produce information about individuals who are currently, or were formerly, in the custody of DSD and who are targets of immigration enforcement. ICE claims to "need" the information sought in the subpoenas, but this is a problem

of its own making and one that ICE can solve on its own.

Federal law is clear that administrative subpoenas are not enforceable absent an order from a federal district court. 8 U.S.C § 1225(d). This Court should decline to issue such an order to DSD in connection with these subpoenas. ICE has failed to demonstrate that these subpoenas were issued in good faith as the requests are burdensome and ICE has access to the information. Service of the subpoenas has nothing to do with a legitimate need, and everything to do with the politics of immigration. Under the circumstances of this case, forcing DSD to comply with the subpoenas would force Denver's law enforcement to become an investigative arm of the federal government in enforcing civil immigration policies in violation of the Tenth Amendment's anti-commandeering doctrine.

**Background**

Denver is a welcoming city inclusive of all people and committed to fostering and ensuring equity, social justice, and freedom from fear of persecution based on race, religious belief, country of origin, sexual orientation, gender, physical ability, or age. Denver has also been labeled by ICE as the front-line in its battle against so-called "sanctuary cities"[1]. In recent weeks, ICE announced its intent to deploy Customs and Border Patrol "SWAT" teams to "sanctuary cities."[2] ICE also directly threatened Denver officials following service of the subpoenas, stating at a press conference and on Fox News that Denver officials should "*show up to court with a toothbrush, because they might not be going home that night, because they could be jailed for failure to comply*

---

[1] https://www.nationalreview.com/news/ice-subpoenas-denver-law-enforcement-in-last-resort-over-sanctuary-city-battle/ (last visited 2.28.2020)
[2] https://www.rollcall.com/2020/01/23/fear-of-ice-raids-during-census-could-hamper-count-of-immigrants/ (last visited 2.28.20).

*with a lawful order from a judge."* [3]

ICE issued these subpoenas in a highly politized context, and the subpoenas themselves reflect an abrupt change from longstanding practice.[4] Denver is not aware of ICE ever serving a subpoena on a local government in the 68 years ICE (or INS) has had subpoena authority. Denver will of course comply with any order of this Court; however, it respectfully requests that the Court decline to issue such an order given ICE's inability to meet its burden of proof.

**A. The administrative subpoenas relate to civil immigration enforcement.**

At issue are three "Immigration Enforcement Subpoenas" to produce records issued to DSD by Assistant Field Office Director Ronald Strong, Department of Homeland Security ("DHS"), dated January 13, 2020 ("administrative subpoenas"). The administrative subpoenas specifically state on their face that they are for civil immigration enforcement issued in connection with the enforcement of U.S. immigration laws. *See* Exhibit B to Pet. DSD is charged with keeping the Denver community safe by enforcing local, state and federal criminal laws. These are not subpoenas issued in connected with a criminal matter.[5]

**B. DSD provided timely notice to ICE of these inmates' release.**

DSD responds to release notification requests concerning individuals in the custody of the Sheriff when properly requested by ICE. *See* Affidavit of Sheriff Fran Gomez, attached as **Ex. 1**. ICE served DSD with 88 release notification requests during the last quarter of 2019 alone. *Id.* at

---

[3] https://www.washingtonexaminer.com/news/show-up-to-court-with-a-toothbrush-ice-says-sanctuary-city-officials-should-expect-jail-time-if-they-ignore-subpoenas (last visited 2.2820).

[4] https://www.ice.gov/news/releases/ice-issues-subpoenas-obtain-information-refused-under-ny-sanctuary-policies (last visited 2.28.20)

[5] DSD requested copies of any then current federal criminal indictments for the three individuals in question, but none were provided. DSD has learned that after the filing of the Petition Sanchez was criminally indicted. Thus, ICE can now obtain, if it truly needs to, a criminal warrant for this information, but these administrative subpoenas should be evaluated in the context in which they were served.

¶ 3; *see also* DSD quarterly reports, attached as **Ex. 2**. DSD dutifully and timely responded to each of those requests, including release notification requests for the individuals identified in the administrative subpoenas.[6] **Ex. 1** at ¶5; *see also* Release times, attached as **Ex. 3**. DSD notifies ICE when the inmate enters the release process, which can take anywhere from 1-3 hours. **Ex. 1** at ¶6; *see also* DSD's ICE Release Policy, attached as **Ex. 4**. ICE received adequate notice and could have taken each individual subject to the administrative subpoenas into custody at that time but elected not to do so. **Ex. 1** at ¶7. Specifically, ICE received 48 minutes notice on Mr. Cecelia Torres-Ibarra, one-hour and 48 minutes notice on Mr. Alvarez-Pacheco and two-hours and two-minutes notice on Mr. Olam Ramires and failed to take them into custody. *Id. at ¶8;* **Ex. 3**. Mr. Juan Miguel Sanchez-Martin is presently in custody in Denver's jail, and he has a hold on him from the U.S. Marshal. Should he be released, both the U.S. Marshal and ICE will be notified pursuant to DSD Policy.

**C. ICE has access to national database sources that include the same information sought in the subpoenas.**

All the information requested in the three administrative subpoenas is available in databases ICE already had access to and relied on to determine probable cause. *See Gonzalez v. ICE*, 2019 WL 4734579, *18-19 (C.D. Cal. Sept. 27, 2019), and excerpt with list of ICE accessible databases, attached as **Ex. 5**. Additionally, DSD's public website and court records provide the following information when an inmate's name is entered: name, age, race, gender, weight, height, hair color, custody status, location, and change of custody notification.[7] ICE used the information

---

[6] ICE issued four administrative subpoenas to Denver's Sheriff, but is only seeking enforcement of three of those subpoenas.

[7] https://www.denvergov.org/InmateSearch

in NCIC[8] and other databases to determine the identity of the subjects at issue and to establish probable cause that the individuals were removable as stated expressly in the 247(N)-request proffered by ICE. *See* ICE 247(N) request, attached as **Ex. 6**.

In determining probable cause, ICE relies on a two-step process as articulated in *Gonzalez*, 2019 WL 4734579, *18-19, and in summary, it details ICE's reliance on IDENT, which is the central DHS-wide system for storage and processing of biometric and associated biographic information. IDENT creates a new biometric input whenever a law enforcement officer has an encounter with an individual and includes a multitude of data inclusive and duplicative of what ICE seeks from DSD with the subpoenas. *See* **Ex 5**.

**Standard of Review**

Pursuant to 8 U.S.C § 1225(d)(4)(A), ICE has the power to:

> require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service, and to that end may invoke the aid of any court of the United States.

ICE's subpoenas are not enforceable without an order from a federal district court. *See* 8 U.S.C § 1225(d)(4)(B)).

To obtain an order approving an administrative subpoena, ICE has the burden to prove that the issuance of the subpoenas satisfied three prongs: (1) "the inquiry is within the authority of the agency, (2) the demand is not too indefinite, and (3) the information sought is reasonably relevant."

---

[8] NCIC and NLETS are national criminal databases containing biographical information and criminal history information including current and past charges.

*U.S. v. Morton Salt Co.*, 338 U.S. 632, 652–53 (1950). The "gist of this requirement" is that the "disclosure sought shall not be unreasonable." *Id*. Similarly*, McLane v. EEOC,* 137 S. Ct. 1159, 1165 (2017) instructs that "if the information sought by an administrative subpoena is relevant to the agency's inquiry, 'the district court should enforce the subpoena' unless the subpoena 'is "too indefinite," has been issued for an "illegitimate purpose," or is "unduly burdensome."'"

Moreover, the law requires that administrative subpoenas be issued in "good faith." *U.S. v. Powell*, 379 U.S. 48, 57–58 (1964). The U.S. Supreme Court articulated the deferential standard for judicial review of administrative enforcement actions and set forth a four-factor test of "good faith" requiring that: (1) the investigation is conducted pursuant to a legitimate purpose, (2) the information requested under the subpoena is relevant to that purpose, (3) the agency does not already have the information it seeks with the subpoena, and (4) the agency has followed the necessary administrative steps in issuing the subpoena. *Id*. at 57-58 Applying this test, ICE cannot meet its burden to enforce the subpoenas.

## Argument

### I. ICE failed to meet its burden under *Morton Salt*.

#### *A. ICE has exceeded its authority in issuing subpoenas to DSD, a local government agency.*

Although ICE enjoys broad authority to issue subpoenas, that authority is not limitless. None of the cases cited by ICE involve issuing subpoenas to local governments. Instead, the administrative subpoenas issued in those cases were issued to private corporations and citizens. *See Morton Salt Co.*, 338 U.S. at 652; *McLane v. EEOC,* 137 S. Ct. at 1165; *U.S. v. Arthur Young & Co.*, 465 U.S. 805 (1984); *E.E.O.C. v. Dillon Companies, Inc.,* 310 F.3d 1271, 1274–75 (10th Cir. 2002). ICE does not cite any authority to support enforcement of administrative subpoenas to

a municipal entity for civil immigration purposes much less requiring a municipal entity to respond to such subpoenas.

ICE argues the administrative subpoena authority of a federal agency is broad because an administrative subpoena is not adjudicative, but rather a "power to inquire." (Pet. at p. 12 (citing *U.S. v. Clarke*, 573 U.S. 248, 254 (2014) and *U.S. v. Powell*, 379 U.S. 48, 57 (1964)). However, the U.S. Supreme Court has also noted that federal immigration enforcement subpoenas issued by ICE (previously INS) are "capable of oppressive use." *U.S. v. Minker*, 350 U.S. 179, 187 (1956). The Supreme Court's warning of the danger of "oppressive" use of ICE subpoenas has become reality in this case. These subpoenas appear to be an abrupt change from ICE's longstanding practice. DSD is not aware of ICE or INS ever issuing similar subpoenas on local government in the 68 years they have had subpoena authority. At the January 23, 2020 press conference announcing these subpoenas, ICE's Acting Director Matthew Albence described ICE's subpoenas to DSD as ICE "utilizing tools that we haven't used before."[9] The fact that in 68 years ICE has never needed to serve administrative subpoenas to do its job is evidence that this request is unnecessary now.

Moreover, when ICE's regulations specifically address local law enforcement agencies, there must be a balance of federal and local powers. For example, many circuits have found that ICE's detainers to a "local law enforcement agency" are only a "request" for local law enforcement to cooperate. *See Galarza v. Szalczyk*, 745 F.3d 634, 643–45 (3d. Cir. 2014) (holding ICE detainers must be interpreted as a "request" on local government to avoid Tenth Amendment constitutional problem). Here the statute authorizing the issuance of the administrative subpoenas – 8 U.S.C.

[9] ICE Public Safety Media Briefing, Jan. 23, 2020, https://www.youtube.com/watch?v=M9cAAnPA2ls, at 19:20.

§1225(d)(4) – must be interpreted as a "request" on local government to avoid Tenth Amendment constitutional problems, as argued in section III below. Since §1225(d)(4)(A) does not plainly state it applies to local governments, ICE has not shown it has statutory authority for issuance of a court order requiring production of the requested information.

***B. The information sought by ICE is too indefinite.***

ICE argues that it need only show that 8 U.S.C. §1225(d)(4)(A) authorizes the agency to investigate "aliens" for a lawfully authorized purpose and that the "definiteness" requirement of the *Morton Salt Co.* test ensures that records sought by the agency can be identified by their description in the subpoena. Pet. at p. 15. However, the facts in *Oklahoma Press Co. v. Walling,* 327 U.S. 186, 198-99 (1946) are far different from the issues here. There, the Administrator of the Wage and Hour Division of the U.S. Department of Labor subpoenaed a newspaper corporation for records to determine if it was violating the Fair Labor Standards Act, including records related to coverage. *Id*. at 208-09. ICE cites the Court's holding that "[i]t is not necessary, as in the case of a warrant, that a specific charge or complaint of violation of law be pending or that the order be made pursuant to one. It is enough that the investigation be for a lawfully authorized purpose, within the *power of Congress to command*." *Id.* at 208-09. As argued herein, the federal government does not have the authority to command or "commandeer" a local government's resources for civil immigration. *See* U.S. Const. amend. X.

The Court also notes that requests for production of documents in an administrative investigation must be "reasonable," and that "this requirement of reasonableness . . . comes down to specification of the documents to be produced, but not excessive, for purposes of the relevant inquiry. This cannot be reduced to a formula; *for relevancy and adequacy or excess in breadth of*

*the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry*." *Id.* at 209 (emphasis added). Here, the subpoenas are indefinite because they are unreasonable and excessive. DSD should not be forced to spend local public safety resources responding to an administrative subpoena after DSD already responded once before to ICE's release notification request. ICE elected not to pick up these individuals upon release and the burden of that decision should not fall to Denver. (*See* **Ex. 7**)

***C. The information ICE seeks is not reasonably relevant.***

ICE argues that its subpoena request is "reasonably relevant" because the documents sought relate to the "aliens" under investigation. Pet. at p. 17. However, the removal of aliens from the U.S. for violating the terms of their admission or continued presence in the country is a civil action, rather than a criminal sanction, because the main purpose is not to punish wrongdoing but to end a continuing violation of the nation's immigration laws. *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) ("We have long recognized that deportation is a particularly severe 'penalty,' but it is not, in a strict sense, a criminal sanction.") (internal quotations and citations omitted); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038-39 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to entry.... The purpose of deportation is not to punish past transgressions but rather to put an end to a continuing violation of the immigration laws.").

The subpoenas themselves make clear they are civil and administrative in nature. Each of the subpoenas are for immigration enforcement subpoenas issued pursuant to 8 U.S.C § 1225, a civil statute used for "expedited removal of inadmissible aliens." Additionally, the requests say the information requested "is in connection with an investigation or inquiry relating to *the enforcement of U.S. immigration laws."* (Exhibit B to Pet.) If there was a federal criminal proceeding, the

requests must cite the criminal proceeding or, at minimum, reference the criminal case. *See* CFR §287.4. ICE failed to do so here, and they should not be permitted to reform its subpoenas after the fact.

### II. ICE failed to meet its burden of good faith under *Powell* because it already has the information sought in the administrative subpoenas.

ICE admitted when it served the release notifications requests for the three individuals in question that it already possessed these individual's biometric data. Pet. at ¶ 9. ICE claims it needs this information to confirm the identity of the people in DSD custody, but ICE has these individuals' fingerprints. What better way to confirm a person's identity than by fingerprints? It also seems implausible that the Department of Homeland Security would need basic information like an individual's address or birthdate from a local sheriff's department. ICE's admission that it has access to this information suggests a political purpose rather than a legitimate law enforcement need.

Additionally, DSD first learned of these subpoenas, not through local law enforcement, but instead through a press release and press conference from ICE in Washington DC, in which Denver officials were threatened: "*They can show up to court with a toothbrush, because they might not be going home that night, because they could be jailed for failure to comply with a lawful order from a judge.*"[10] Administrative subpoenas were also served on another so-called "sanctuary city" – New York City – at the same time as Denver. Evidence of this broader campaign against "sanctuary cities" include a recent announcement that it will send "SWAT" teams into these cities for civil immigration enforcement, as well as withhold federal grant funds from these same

---

[10] https://www.washingtonexaminer.com/news/show-up-to-court-with-a-toothbrush-ice-says-sanctuary-city-officials-should-expect-jail-time-if-they-ignore-subpoenas (last visited 2.28.20).

communities.[11] *See* e.g. Jan. 31, 2020 City of New York Letter to ICE, attached as **Ex. 8**.

Further, the requested records are already available to ICE through various databases that it may readily access without wasting DSD's time and resources in responding to subpoenas after previously responding to ICE's release notification request. Pet. at ¶ 9. Even ICE's own records establish that it already has access to the data it seeks from DSD. In its an I-247(N) release notification request for each individual, ICE notes that "DHS has determined that probable cause exists that the subject is removable, and the probable cause *has been verified by biometric data."* **Ex. 6**; *Gonzalez v. ICE*, 2019 WL 4734579, *18-19 (C.D. Cal. Sept. 27, 2019) (wherein ICE's relies on these federal databases as "reliable" to determine probable cause). The fact that ICE has access to and possession of this data undermines the assertion that these subpoenas were issued in good faith and underscores they are unnecessary and duplicative.

Moreover, the three individuals in question all have prior orders of removal, which makes them subject to mandatory detention and reinstatement of that order, without any review. *See* Pet. at ¶10. There is no need for further investigation or any additional information about criminal history when these individuals are already subject to automatic removal.

**III. Requiring local law enforcement to use its resources in furtherance of civil immigration issues violates the Tenth Amendment.**

Pursuant to the Tenth Amendment, the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. ICE has no power to issue direct orders to DSD, nor should require Denver to use its's resources to perform ICE's job. Other federal courts have rejected this

[11] https://www.rollcall.com/2020/01/23/fear-of-ice-raids-during-census-could-hamper-count-of-immigrants/ (last visited 2.28.20).

Presidential Administration attempts to interfere with local law enforcement policy in furtherance of civil immigration enforcement, under Tenth Amendment grounds.[12]

***A. ICE attempts to "commandeer" Denver's Sheriff.***

While the federal government's power to preempt activity in immigration is extensive, there are constitutional limits to its power to influence state and local activity. Notably, it may not directly "commandeer" state or local governments into the service of federal immigration authorities. *See New York v. U.S.,* 505 U.S. 144, 145, (1992)[13]; *Printz v. U.S.*, 521 U.S. 898, 935, (1997). Justice Alito recently articulated the anti-commandeering concept in *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475–77 (2018), reminding us that the Constitution did not abolish the sovereign powers of the States, which retained "a residuary and inviolable sovereignty." Instead, "both the Federal Government and the States wield sovereign powers, and that is why our system of government is said to be one of "dual sovereignty." *Id.*

> The legislative powers granted to Congress are sizable, but they are not unlimited. The Constitution confers on Congress not plenary legislative power but only certain enumerated powers. Therefore, all other legislative power is reserved for the States, as the Tenth Amendment confirms. And conspicuously absent from the list of powers given to Congress *is the power to issue direct orders to the governments of the States*. The anticommandeering doctrine simply represents the recognition of this limit on congressional authority. *Id.* (emphasis added).

ICE attempts to commandeer Denver's sovereignty by: (1) forcing it to administer and enforce its federal immigration program; (2) conscripting DSD as one of its agents;[14] and (3)

---

[12] *See, e.g.*, *City of Chicago v. Sessions*, 321 F.Supp.3d 855 (N.D. Ill. 2018).

[13] The *New York* case involved a federal law that required a State to either "take title" to low-level radioactive waste or to "regulat[e] according to the instructions of Congress." 505 U.S. at 175. Congress then issued orders to either the legislative or executive branch of the state government. *Id*. The Court held the provision unconstitutional because "the Constitution does not empower Congress to subject state governments to this type of instruction" and "Congress lacks the power to compel the States to require or prohibit those acts." *Id.* at 176.

[14] Denver's police and sheriffs are not trained to perform immigration work, which is evidence that Denver should abstain from doing anything related to this federally regulated area. Generally, it is not a crime for a removable alien

shifting the costs to Denver[15] to enforce the Executive Branch's policies. *See* generally, *New York*, 505 U.S., at 17; *Printz*, 521 U.S. at 935, and *Murphy,* 138 S.Ct. at 1477.

In *Printz*, the Court applied the same principles to a federal statute requiring state and local law enforcement officers to perform background checks and related tasks in connection with applications for handgun licenses. *Printz,* 521 U.S. 898. This provision was held unconstitutional, and the Court stated succinctly: "[t]he Federal Government" may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Id.* at 935.

Moreover, the anticommandeering rule promotes political accountability by striking "a healthy balance of power between States and the Federal Government [and reducing] the risk of tyranny and abuse from either front." *Id.,* at 181–182 (citations omitted). By issuing these subpoenas, ICE is commanding Denver officers, through one of its political subdivision, to administer or enforce federal immigration law. It is the federal government's job to enforce the civil immigration laws; not Denver's agencies. DSD has expended resources in providing timely notice to ICE of the release of inmates. (*See* **Exs. 1** and **3**). DSD should not be forced to divert precious public safety resources (*See* **Ex.** 1 at ¶ 10 and **Ex. 7**) away from enforcing its criminal laws to act as an agent of the federal government in investigating and enforcing civil immigration law, especially when the request is for information ICE already has, or the request is politically-

---

to remain present in the United States. *See Lopez–Mendoza,* 468 U.S. at 1038. If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent. When an alien is suspected of being removable, a "Notice to Appear" is issued. *See* 8 U.S.C. § 1229(a); 8 CFR § 239.1(a). There are significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable. *See Padilla,*559 U.S. at 379–380. As a result, there must be written certification that officers have received adequate training to carry out the duties of an immigration officer. *See* § 1357(g)(2); cf. 8 CFR §§ 287.5(c) (arrest power contingent on training), 287.1(g) (defining the training).

[15] *See* 2.24.20 DSD's Biweekly Overtime and Budget Report, attached as **Ex. 7**.

motivated and designed to involve DSD in civil immigration enforcement.

***B. Denver's Act does not preempt ICE.***

ICE misrepresents Denver's position regarding it local ordinance. Denver did not rely on its Public Safety Enforcement Priorities Act in refusing to comply with the administrative subpoenas. (Pet. at pp. 18-21). The Act complies with federal law and would require DSD to produce records in response to any validly-issued court order. Therefore, the Supremacy Clause set forth in the Petition is not relevant.

**Conclusion**

Denver does not and will not investigate and enforce federal immigration law. That is the federal government's job. Denver police officers and sheriff deputies are here to protect and serve all people in the City and County of Denver regardless of status. Denver's public safety resources are precious, and it must defend itself against those who would co-opt those resources for unfounded political purposes.

WHEREFORE, Respondent Sheriff Fran Gomez, respectfully requests that this court DENY the U.S. Immigration and Customs Enforcement's Petition to Enforce the Administrative Subpoenas and any other relief that may be just and equitable.

Respectfully submitted this 28th day of February 2020.

**KRISTIN M. BRONSON**
**Denver City Attorney**

By: *s/ Reneé A. Goble*
Kristin M. Bronson
Reneé A. Goble
Denver City Attorney
City and County of Denver
201 West Colfax Avenue, Dept. 1207
Denver, CO 80202-5332

(720) 913-3275
kristin.bronson@denvergov.org
renee.goble@denvergov.org
*Attorney for Respondent*

**CERTIFICATE OF SERVICE (CM/ECF)**

I certify that on the 28th day of February 2020, a true and correct copy of the foregoing **RESPONSE TO PETITION TO ENFORCE ADMINSTRATIVE SUBPEONAS** was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

JOSEPH HUNT
Assistant Attorney General

EREZ REUVENI
Assistant Director

Francesca Genova
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
francesca.m.genova@usdoj.gov

*Counsel for U.S. Immigration and Customs Enforcement*

JASON R. DUNN
U.S. Attorney

Kyle Brenton
Kevin Traskos
Assistant U.S. Attorneys
kyle.brenton@usdoj.gov
kevin.traskos@usdoj.gov

*Counsel for U.S. Immigration and Customs Enforcement*

*s/ Reneé A. Goble*
Kristin M. Bronson
Reneé A. Goble
Denver City Attorney
City and County of Denver
201 West Colfax Avenue, Dept. 1207
Denver, CO 80202-5332
(720) 913-3275
kristin.bronson@denvergov.org
renee.goble@denvergov.org
*Attorney for Respondent*